UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IRA ALSTON, : | |
|     Plaintiff, : | |
| : | |
| v. : | CASE NO. 3:12-cv-811 (CSH) |
| : | |
| BRIAN K. MURPHY, et al., : | |
|     Defendants. : | |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

<u>HAIGHT,</u> Senior District Judge:

Plaintiff Ira Alston, currently incarcerated at the Northern Correctional Institution in Somers, Connecticut, has filed a Complaint, [Doc. 1], challenging the institutional practice of requiring inmates confined in Phase I of the Security Risk Group Safety Threat Member Program to recreate with their hands handcuffed behind their backs. Plaintiff avers that this practice deprives him of an opportunity for meaningful exercise. His Complaint, which was filed pursuant to 42 U.S.C. § 1983, seeks damages.[1] On September 26, 2013, Defendants Brian K. Murphy, Michael P. Lajoie, Angel Quiros, Leo Arnone, and Edward Maldonado filed a Motion for Summary Judgment, [Doc. 56]. Plaintiff was granted several extensions of time in which to file an opposition to Defendants' summary judgment motion, the last of which set a deadline of Monday, March 31, 2014 for any such response. *See* [Doc. 67]. A full week has passed since that March 31, 2014 deadline and no opposition has been filed; consequently Defendants' Motion for Summary Judgment is now ripe for adjudication.

---

[1] Plaintiff's Complaint also sought injunctive relief. However, on March 14, 2013, the Court issued a Ruling denying Plaintiff's Motion for Preliminary Injunctive Relief. *See* [Doc. 46].

I.     **Standard of Review**

The standards for summary judgment are familiar. Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). The role of a district court in considering a motion for summary judgment is therefore "not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009). A party moving for summary judgment bears the burden, on the claims made within that motion, of showing that it is entitled to summary judgment. Once it has satisfied this burden, the party opposing that particular summary judgment motion "must set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir 2009) (internal quotation marks omitted). A dispute about a genuine issue of fact exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In making its determination on a summary judgment motion, a trial court will resolve all ambiguities and draw all inferences contained within that motion in favor of the party against whom summary judgment is sought. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 274 (2d Cir. 2009). It is "[o]nly when reasonable minds could not differ as to the import of the evidence" that summary judgment is proper. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). When "a motion for summary judgment is properly supported by documentary and testimonial evidence ... the nonmoving party may not rest upon the mere allegations or denials of

his pleadings, but rather must present significant probative evidence to establish a genuine issue of fact." *Marczeski v. Gavitt*, 354 F.Supp. 2d 190, 193 (D. Conn. 2005) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986)). In order to present a "genuine issue of material fact" the party opposing a particular motion for summary judgment must therefore present contradictory evidence "such that a reasonable jury could return a verdict for [that] party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. Consequently that party must present affirmative evidence in order to defeat a properly supported summary judgment motion. As the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," *id.* at 247-48, if the party opposing a particular summary judgment motion submits evidence that is "merely colorable," summary judgment may be granted. *Id.* at 249-50. In sum, a "complete failure of proof concerning an essential element of [that] party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. at 322.

## II. Facts[2]

Plaintiff, a sentenced inmate, was confined at Northern Correctional Institution ("NCI")

---

[2] These facts are taken from Defendants' Local Rule 56(a)(1) Statement, [Doc. 56-11]. Local Rule 56(a)2 requires the party opposing summary judgment – here, Plaintiff – to submit a Local Rule 56(a)2 Statement which contains separately numbered paragraphs corresponding to the moving party's Local Rule 56(a)1 Statement and indicates whether the opposing party admits or denies those facts set forth by the moving party. Each admission or denial must include a citation to an affidavit or other admissible evidence. In addition, the opposing party must submit a list of disputed factual issues. *See* D. Conn. L. Civ. R. 56(a)2 and 56(a)3. Despite receiving specific notice from Defendants regarding his obligation to respond to the Motion for Summary Judgment and the contents of a proper response as well as several extensions of time from the Court to submit his response, Plaintiff has not opposed Defendants' summary judgment motion. Accordingly, Defendants' facts are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)1 (providing that all material facts set forth in the Local Rule 56(a)1 Statement "will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party") .

from September 11, 2003, until he was transferred to MacDougall-Walker Correctional Institution ("MWCI") on February 5, 2013.  He remains confined at MWCI.

The Department of Correction has designated Plaintiff as a member of the Security Risk Group or gang, the "Bloods."  Persons recognized as gang leaders or whose behavior in a gang-related event jeopardizes institutional safety and security are designated Security Risk Group Safety Threat Members ("SRGSTM").  Plaintiff was designated a SRGSTM on September 3, 2004, after he was involved in a fight at MWCI.[3]  The Department of Correction created the SRGSTM Phase Program in the 1990s to address issues arising from gang affiliations.  The program, which is located at NCI, had three phases.  Known gang members were required to participate in and successfully complete all three phases of the program before they could return to general population.  The program was based on the assumption that gang members who engaged in aggressive, violent or disruptive behavior and who posed a risk to the public, staff or other inmates required a highly structured, secure environment.  Phase 1 was the most restrictive phase.  Inmates were required to participate in Phase 1 for a minimum of four months before they were reviewed for progression to Phase 2.

In Phase 1, inmates remained in their cells twenty-four hours per day with the following exceptions: one hour per day of recreation, offered five days per week in a controlled environment; three fifteen-minute showers per week; three fifteen-minute telephone calls per week; and two thirty-minute non-contact visits per week with immediate family members if the

---

[3] Defendants state that Plaintiff was involved in a fight at MWCI on September 3, 2004, but that he was confined at NCI from September 11, 2003, through February 5, 2013.  Both dates cannot be correct.  Whether the fight occurred in 2003 or the transfer to NCI occurred in 2004, however, is irrelevant to the issues in this case.

inmate had not recently received disciplinary sanctions. Inmates in Phase 1 were encouraged, but not required, to attend recreation. Inmates in Phase 1 attended recreation in groups of eight inmates in a controlled area supervised by correctional staff. Inmates were expected to remain in Phase 1 for at least 120 days. This period could be extended depending on a particular inmate's behavior or disciplinary history. Before progressing to Phase 2, an inmate had to be discipline-free for 120 days. The expected stay in Phase 2 was 90 days, and the expected stay in Phase 3 was 60 days.

In 2009, the number of inmate fights in the recreation yard involving Phase 1 inmates increased dramatically. The number of Phase 1 inmates assaulting staff members also increased. Inmate fights jeopardize the safety and security of the entire correctional facility. All inmates in the recreation yard are at risk of injury when a fight takes place, as are those members of the correctional staff who respond and attempt to break up such an incident. Inmate fights and disturbances can also lead to riots. In addition, inmates may take hostages or attempt to escape. The Commissioner of Correction formed a committee to address the increased fights and assaults among the SRGSTM Phase 1 inmates. The committee explored many options to address safety concerns during recreation including denying recreation altogether, requiring inmates to recreate in cages, using no restraints, requiring only some inmates to recreate in restraints and requiring all inmates to recreate in restraints. In October 2009, the committee decided that inmates would recreate in handcuffs. Initially, inmates were handcuffed with their hands in front. When the number of assaults did not diminish, this policy was changed to handcuffing inmates with their hands behind their backs for recreation purposes. This change took effect in January 2010. Since the change, the number of inmate fights during recreation has dramatically decreased. For

example, in the 2009 calendar year, there were 34 inmate fights during recreation. In the first seven months of 2010, however, there were only 3. Correctional officials attribute this decrease to the requirement that inmates in Phase 1 attend recreation with their hands cuffed behind their backs.

In February of 2013, the SRGSTM Phase Program was transferred from NCI to the Walker building at MWCI. A few months later, i.e., in June of 2013, the Department of Correction modified the SRGSTM Phase Program and renamed it the SRGM Phase Program. The changes which were then put into place were designed to accommodate the needs of younger and more violent gang members as well as the needs of older gang members who continue to engage in aggressive, violent and disruptive behavior. There are now five phases of the program rather than three, and inmates enter the program in one of the first three phases depending upon the incident which necessitated program placement. Inmates are eligible to progress to all phases after the phase in which they enter the program if they remain discipline-free for two months. The stay in the initial phase, however, is longer; for example inmates are expected to remain in Phase 1 for six months. Despite these differences, Phase 1 inmates remain in their cells for twenty-four hours per day with the following exceptions: three fifteen-minute showers per week; three fifteen-minute phone calls per week; two thirty-minute non-contact visits per week with immediate family members if the inmate has not recently received sanctions; and one hour of recreation, five days per week. Inmates in Phase 1 continue to wear restraints behind their backs during recreation.

While he was confined at NCI, Plaintiff alternated between the SRGSTM Phase Program and the Administrative Segregation Program. Inmates were placed in the Administrative

Segregation Program, another progressive phase program, when they could not safely be managed in general population.  At NCI, if an inmate in the SRGSTM Phase Program demonstrated assaultive or violent behavior, the inmate would be removed and placed in the Administrative Segregation Program.  After completing that program, the inmate would return to the SRGSTM Phase Program to continue his programming.  Plaintiff participated in the SRGSTM Phase Program from October 14, 2005 through February 15, 2007, from June 6, 2011 through October 12, 2011, and from March 21, 2012 through June 7, 2013.  From June 7, 2013 through the date on which Defendants' Motion for Summary Judgement was filed, i.e., September 26, 2013, Plaintiff participated in the SRGM Phase Program.

     While in Connecticut Department of Correction custody, Plaintiff has received at least 179 disciplinary reports.  Many such reports were issued as a result of his violent and assaultive behavior, including charges for threats, fighting and assaulting staff.  More recently, Plaintiff received seventeen disciplinary reports in 2009, twenty-seven in 2010 and ten in 2011.  While in Phase 1 of the SRGSTM Phase Program in 2012, Plaintiff received disciplinary reports for interfering with safety and security and fighting in April, disobeying a direct order in May, and possession of sexual material in July.  These disciplinary reports caused Plaintiff to remain in Phase 1 for more than the minimum 120 days prescribed by the program design.

     Plaintiff progressed to Phase 2 on October 17, 2012.  On November 27, 2012, however, he received a disciplinary report for interfering with safety and security and regressed to Phase 1.  He received three additional disciplinary reports on February 1, 2013.  On February 5, 2013, Plaintiff, along with the other inmates in the SRGSTM Phase Program, was transferred to MWCI.  While in Phase 1 at MWCI, he received additional disciplinary reports for security

tampering and fighting in March, security risk group affiliation in April, security tampering in May, interfering with safety, disobeying a direct order and security and security tampering in July, and two counts of security tampering in August.  The disciplinary report for fighting in March 2013 was the result of Plaintiff attacking another inmate in the MWCI recreation yard even though his hands were cuffed behind his back.  Plaintiff pled guilty to kicking the other inmate.  As a result of his behavior, at the time Defendants filed their Motion for Summary Judgment Plaintiff remained in Phase 1.

Dr. Carson Wright treated Plaintiff while he was confined at NCI.  Dr. Wright also has reviewed Plaintiff's medical records through September of 2013.  Dr. Wright states that his examinations and review of the medical records show no evidence that Plaintiff had suffered any physical health problems as a result of his alleged lack of exercise.  He also states that there is no medical evidence that recreating while restrained caused the plaintiff to suffer any physical injuries.  *See* [Doc. 56-7].

Dr. Mark A. Frayne is a mental health professional at NCI who treated the plaintiff from April of 2006 until the plaintiff was transferred to MWCI in February of 2013.  He has reviewed Plaintiff's medical records, and has averred that since December of 2000, Plaintiff has had a mental health score of 2.  An inmates in this classification does not have a significant history of mental health issues; rather such an individual is considered mentally stable and receives mental health treatment upon request.  Dr. Frayne also notes that Plaintiff has been diagnosed with Antisocial Personality Disorder with Narcissistic features, and Dr. Frayne states that he is not aware of any instance since 2006 where Plaintiff's mental health has been compromised by any correctional program.  Dr. Frayne opines that the Plaintiff's mental health has not deteriorated as

a result of the requirement that Plaintiff must recreate while restrained, and, further, that there is no evidence that Plaintiff suffered any mental health problems as a result of the alleged lack of exercise or the requirement that he recreate while restrained.  *See* [Doc. 56-12].

Plaintiff's cell at NCI was approximately 7' x 12' and contained two narrow bunks, a metal desk with a metal stool welded to it and a sink and toilet.  All of the furniture was affixed to the wall and could not be moved.  Both Dr. Wright and Plaintiff indicate that there wass sufficient room within this cell to perform in-cell exercises.  In addition, Plaintiff stated at his deposition that for a time he performed jumping jacks, push-ups and lunges in his NCI cell.  Dr. Wright states that an inmate can achieve substantial cardiovascular benefits from performing yoga, stretching and isometric exercises in his cell, and that he has observed many inmates regularly exercising in their cells and believes that inmates can exercise in their cells without disturbing their cellmates or inmates in other cells.  Plaintiff states that he has not been harmed by another inmate as a result of exercising in his cell at MWCI and has not observed any inmate fights as a result of in-cell exercising at MWCI.

Throughout Plaintiff's confinement in Phase 1 of the SRGSTM and SRGM Phase Programs, Plaintiff has had the opportunity to attend recreation for one hour per day, five days per week; Dr. Wright states that, even with his hands restrained behind his back, Plaintiff is able to walk around the exercise yard, breathe fresh air, enjoy sunshine and socialize with other inmates, and that accordingly Plaintiff may receive substantial cardiovascular benefits and meaningful exercise by walking briskly about the recreation yard.  Plaintiff also conceded at his deposition that he has and continues to walk around the recreation yards at NCI and MWCI when he chooses to attend recreation.

### III.     Legal Discussion

Defendants move for summary judgment on two grounds: (1) that Plaintiff cannot state an Eighth Amendment claim; and (2) that they are protected by qualified immunity.  Given that the Court concludes that qualified immunity is warranted under the circumstances at bar, the Court need not and does not separately address Defendants' Eighth Amendment claim.

A state official is protected by qualified immunity from a suit for monetary damages unless a plaintiff can show that the state official violated a statutory or constitutional right and that this right was "clearly established" at the time of the alleged violation.  *Ashcroft v. al-Kidd*, 563 U.S. __, 131 S. Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right [were]sufficiently clear that every reasonable official would have understood that what he [was] doing violate[d] that right." *Id.* at 2083 (internal quotation and grammatical marks and citation omitted).  A court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*  Consequently, "[i]f an official's conduct did not violate a clearly established constitutional right, or if the official reasonably believed that his conduct did not violate such a right, then he is protected by qualified immunity." *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013); *Pearson v. Callahan*, 555 U.S. 223, 232-33 (2009).

Exercise is a basic human right that must be provided for all inmates.  However, the Second Circuit has created a safety and security exception to this right.  *See Williams v. Greifinger*, 97 F.3d 699, 704 (2d Cir. 1996) (acknowledging a safety exception to the constitutional right to exercise but holding that an inmate who refused to take a tuberculosis test

10

could not be denied all out-of-cell exercise). "[R]estrictions on exercise must be limited to 'unusual circumstances' or circumstances in which exercise is 'impossible' because of disciplinary needs." *Id.* (citations omitted) (made specifically in reference to holdings by other Courts of Appeals); *see also, e.g., Dumpson v. McGinnis*, 348 F. App'x 658, 659 (2d Cir. 2009) (affirming limitations on a prisoner's right to exercise for legitimate safety concerns where defendant prison officers had established at trial that their decision with respect to these limitations was reasonable in light of the inmate's disciplinary history).

Within this district, the requirement that some inmates attend recreation wearing restraints has been consistently upheld as long as the inmate has some opportunity for exercise either inside or outside of his cell. In *Taylor v. Murphy*, No. 3:10-CV-00245, 2012 WL 4512510 (D. Conn. Sept. 30, 2012), for example, a plaintiff inmate challenged a recreation-in-restraints policy in effect at the correctional institution at which he was housed, claiming that this policy denied him a meaningful opportunity to exercise. After a bench trial, the district court found that the SRGSTM Phase Program policy – i.e., the same policy at issue in this case – was established as a direct result of safety and security concerns and that, as the plaintiff was able to perform exercises in his cell and, even with his hands cuffed behind his back, by walking about the recreation yard as well, the plaintiff inmate's Eighth Amendment rights had not been violated. *Id.* at *1-*13. *See also, e.g., Shakur v. Sieminski*, No. 3:07CV-01239, 2009 WL 2151174, at *4-6 (D. Conn. July 15, 2009) (inmate making a similar Eight Amendment claim did not dispute that he was able to exercise in his cell); *Morgan v. Rowland*, No. 3:01-CV-01107, 2006 WL 695813, at *6-8 (D. Conn. Mar. 17, 2006) (same). Other district courts within this circuit have similarly upheld a requirement that inmates attend recreation wearing restraints, on the same reasoning

that these inmates were able to obtain exercise by walking about the recreation yard. *See*, *e.g.*, *Mitchell v. New York State Department of Correctional Services*, No.6:06-CV-06278, 2012 WL 6204205 at *4-5 (W.D.N.Y. Dec. 12, 2012) (holding that a policy which required an inmate to attend recreation in restraints that sometimes were too tight and once caused him to fall without serious injury did not, as a matter of law, violate the Eighth Amendment); *Dawes v. Coughlin*, 964 F.Supp. 652, 658-59 (N.D.N.Y. 1997) (holding that a policy which required an inmate to attend recreation in full restraints for safety and security reasons did not constitute an Eighth Amendment violation because the inmate could walk about the recreation yard while retrained in such a manner).

In the case at bar, the Court need not – and does not – address whether Plaintiff's constitutional right to exercise was violated.  This is because the caselaw record in this district and circuit makes abundantly clear that even if Plaintiff's Eighth Amendment rights *had* been violated – and Court does not address or voice an opinion on whether this was the case – Defendants nonetheless had a very strong basis for reasonably understanding the conduct at issue not to violate any clearly established constitutional right and, accordingly, they are entitled to the protections of qualified immunity.  "If an official's conduct did not violate a clearly established constitutional right, or if the official reasonably believed that his conduct did not violate such a right, then he is protected by qualified immunity." *Walker v. Schult*, 717 F.3d at 126.  No Supreme Court or Second Circuit case has held that requiring an inmate to recreate in restraints for security reasons is unconstitutional; no case in this district has held that the policy of requiring inmates in the SRGSTM or Administrative Segregation Programs to recreate in restraints is unconstitutional; Defendants have provided evidence, through Security Risk Group

12

Coordinator John Aldi's affidavit, [Doc. 56-5], of the security problems that led to the development of the restraint policy and the resulting decline in security-related recreational issues after the policy was implemented; and, lastly, Plaintiff himself has conceded that he was able to obtain benefits from attending recreation in restraints, including the ability to walk about the recreation yard.

Under these facts, the Court concludes that Defendants would not have reasonably understood that a policy which required Plaintiff to attend recreation in restraints which bound his hands behind his back was unconstitutional. Defendants are therefore protected by qualified immunity, and this case is DISMISSED.

## IV. Conclusion

For the reasons articulated above, Defendants' Motion for Summary Judgment [Doc. 56] is GRANTED. The Clerk is directed to enter judgment in favor of Defendants and to close the file.

It is SO ORDERED.

Dated:  New Haven, Connecticut
         April 8, 2014

                                            /s/ Charles S. Haight, Jr.
                                            Charles S. Haight, Jr.
                                            Senior United States District Judge